On behalf of the defendant appellants, I'm asking the court to hold two things today. First, that the federal courts have subject matter jurisdiction under CAFA, the Class Action Fairness Act. And second, that the district court in this case erred in abstaining and declining to exercise that jurisdiction under CAFA's local controversy exception. So this court should reverse, and this case should proceed in the Middle District of Louisiana. On subject matter jurisdiction, unless the court has questions about the other elements of CAFA jurisdiction, the only issue is whether the class has at least 100 members. The plaintiff's first amended petition identifies two groups of class members. First group is sheriffs in their official capacity as constitutionally elected public officers. The second group is law enforcement districts, which are legislatively created special districts, specifically designed to be separate, different, and independent from the sheriffs. The statute that creates the law enforcement districts is Louisiana Revised Statute Section 13-5901. It specifically says the districts are established to assist the sheriffs and therefore cannot have the same legal capacity as the sheriffs. Section 5904 outlines additional powers of the districts. That statute specifically says the districts can contract on their own behalf, can bind themselves, and those obligations, those duties, those contracts can exceed the term of any elected sheriff, which a sheriff in his official capacity cannot do. Looking at the case law and the way that courts have treated the districts, it's clear that the districts can sue and be sued in their own name. The magistrate judge in this case specifically relied on a Louisiana Third Circuit case called Law Enforcement District of the Parish of Avoyles. In that case, the law enforcement district was the plaintiff, not the sheriff. We also outline cases on page 7 and 8 of our reply brief where the law enforcement districts have brought suit in their own right, in their own name. The sheriffs are not parties in those cases. So it seems clear to me that there are at least 100 members of the class, as alleged, in plaintiff's First Amendment petition, and this court has subject matter jurisdiction. On the local controversy exception, again, there's numerous elements. The only ones we dispute are significant basis and significant relief. I'm going to focus on significant basis because I think that that's the shortest path to resolution for this court. This court has already addressed the significant basis test in Opelousa's General Hospital versus Fair Pay Solutions. The parties agree that that case controls. And that case specifically says that in order to prove the significant basis prong of the local controversy exception, the court needs detailed allegations or extrinsic evidence to enable a substantive comparison between the local defendant on the one hand and the other defendants on the other hand. Where nothing in the complaint distinguishes the local defendant's conduct from the out-of-state defendant's conduct, or the complaint does not allege facts describing the local defendant's conduct, the local controversy exception fails. We think that those principles control here. If I understand correctly, we have basically two time periods in this case, right? Yes. So from 2015 to 2018, I'm sorry, let me step back. Another premise of the case, as I understand it, is what the case is about, in terms of creating damages, is conduct from 2015 to 2020. Correct. The entire time period. Okay. Do I understand correctly, 2015 to 2018 is only local defendants? Correct. 1120 South Point LLC is the local defendant at issue here. 1120 South Point LLC, or 1120 South Point Properties LLC, South Point contracted with the sheriffs from 2015 to 2018, provided software products, technology services during that time period. In 2018, out-of-state defendants, I3 Software and Services, LLC, and then its parent companies, I3 Verticals, LLC, I3 Verticals, Inc., took over. So you're correct. Takeover. I3 Software and Services, LLC, bought the business of South Point. So all the IP, all the software, all the technology, the brand name, the business goodwill, the customers, the contracts, all of that becomes the property of I3 Software and Services, which we call— So the corporate ownership changes. Yes. What about the operations in terms of the business conduct? Because obviously the case is not— So those change as well, because there are contracts in the record. If you look at those contracts, they're for one-year terms. They get renewed every year. So if you have a contract that ends in 2018 and it's taken over by a new company, there's a new contract, new products, new services. They're different for every sheriff. Because they bought all the products. And so did they physically remove all the code and start over with new— because if it's the code that's the problem, which I'm not sure, you know, then the code would be—it might be updated and patched and all of that, but it's still the same code and so would continue to perhaps have residual— I mean, I don't know whether it does or not. So what the sheriffs argue and what the sheriffs in their briefs point the court to, where they say they have provided very detailed allegations, is paragraph 48 of the First Amendment petition and paragraph 75 of the First Amendment petition, which is simply a reorganized paragraph 48. It says the same thing. And if you look at those paragraphs, it's not merely— isolated, discrete, start-and-stop conduct. It's not something that's going to persist unabated from 2015 to 2020. This isn't an oil leak. This isn't an exposure. This isn't— But code sits underneath there. And isn't this dealing with the cybersecurity of the code? And if there are problems with the code, you don't rebuild— you don't rip out the old code and start over. Perhaps you do if you try a brand-new system. But this was just a purchase of the existing system that would be patched and updated, so you'd always still have your underlying code. I still don't understand. So we don't have that specific of allegations, and the contracts themselves don't suggest that that's what's happening. So the contracts in the record— Do you have any sense—I mean, do you have any— I mean, I guess it's on them to put in their allegations. Correct. But there's nothing in the record to assume that this would be different than normal business practices. You don't start over. Well, I think with— Unless you go with a new company that's really new or they have some brand-new product that they uninstall everything. The technology products that they're providing, if you read the allegations of paragraph 48 and the allegations of paragraph 75, are things like Adobe Creative Cloud software, Microsoft Word. That's not code provided by the defendants, the i3 companies. Those are existing software applications created by other people that they provide, they administer, they upload. They customized them for the industry. They customized them for their— Right, and apply it to what the sheriffs are doing in their day-to-day business. But i3 is not writing the code for Microsoft Word. That seems to support—that cuts the other way, doesn't it? I don't think so, because— And so they're still using the same off-the-shelf and modifying for their uses. But, again, looking at the contracts that are in the record, it changes from year to year. The services provided, the products provided change from year to year. And to say that they don't identify where the issues lie, they don't say that this stayed dormant in their systems for five years unabated, it's their obligation to come forward with specific allegations or detailed extrinsic evidence. They haven't done that. The magistrate judge assumed that we can say everything happened all the time for five years, but that's not what the petition says, and that's not what those paragraphs say. Looking at the petition as a whole, and the magistrate judge in particular, identified one instance of bad conduct, a failure to renew an email filter in 2016, that then says impacted the I3 company's network. It doesn't explain the connection between that and the sheriff's network. But then looking at the petition as a whole, there's a whole lot of post-2018 conduct. For example— I understand the point. If I may, let me share with you the model I have in mind, so I want you to have the chance to rebut it or explain why it doesn't apply. Imagine a local New Orleans law firm is my law firm. They do all my work. I'm a client. And the New Orleans firm is then merged, bought into by one of the big global law firms. I'm still the client. All I deal with is my local New Orleans lawyers, but obviously it's no longer a New Orleans firm. It's this massive firm. That's sort of the image I have in mind with this case. Am I wrong? Or is that an appropriate analog to what's going on here? In other words, I see the ownership. When a law firm—when a big law firm merges with a small law firm, lots change for those local lawyers. But from the client's perspective, we're just continuing on with the same business. Sure, but if you're talking about that law firm had to do something bad to you, the lawyers are different, the activities they carry out are different, and you'd have to identify where you were wronged. So if your first firm did something bad to you, when the new firm takes over, that new firm, if it also did something bad to you, that's a separate bad thing. You have two actions there, one for previous conduct, one for new conduct. And that's what's happening here. You're saying there's nothing in the petition that alleges any misconduct between 15 and 18? It's only about 18 to 20? Well, the petition says at times between 2015 and 2020, lots of bad things happened. We can't tell you when they happened, and we can't tell you who did it, but rest assured at various times between 2015 and 2020, bad things happened. But under CAFA's local controversy exception, they are obligated to tell us when the bad things happened and who did them. And if you can't, you fail. To disaggregate between instances. Correct. If you can't, you fail because you haven't proven that the local defendant's conduct is significant in comparison to the non-local defendant's conduct. Did they not say Louisiana Defendants 1120 Southpoint and Gregory Teeters were exclusively responsible for the sale of the defective software products? It does say that. From 2015 to 2018, it does say that. But that doesn't explain— They told us exactly who and what they did. They sold defective products in the time period. But how were the products defective? It doesn't distinguish. There's no detail on those allegations. There's no specific facts. There's no facts describing what is bad about those products. And it doesn't— Again, this isn't a scenario where it's not a contamination, it's not a leak. There are point of sales that happen at specific times to specific people of specific products. It can't be true, and it's not true, that every single product sold to every single person was bad. And even if that were true, there would be definitive times where that's taking place. It contained malware. We know that, too, what the defect was. I don't—I mean, the— It contained malware. That's the defect. Again, you would have to be assuming, contrary to this court's precedent, that doubts are construed in favor of keeping the case that every single product was defective all the time, sold to everyone constantly. We also know that that's not true based on the petition, because allegations of the petition said that there were investigations into the various sheriff's network, and only some of them were impacted. So it cannot be true that every single piece of— every single product, every single service provided was defective, contained malware. Because that doesn't make any sense. Does it have to be every single—is that a straw man? I don't—I think it would have to be every single product if we're assuming that 2015 to 2018 is going to make it significant. Because, again, the petition says at times between 2015 and 2020. It's not like—this isn't a scenario where it's happening starting January 1, 2015, and continuing through December 31, 2020. These are discrete, isolated acts, discrete allegations of conduct. They just can't tell us who did them and don't want to. But that fails the significant— What I'm hearing you saying is the plaintiffs allege injuries from your client that must have been caused by conduct sometime between 15 and 20, but they in no way identify whether it was 2015, 16, 17, 18, 19, 20, or some accumulation. They just don't say it at all. Right. And, therefore, they have not done the disaggregation. Is that right? Correct. Do you want to—I don't mean to shift, but do you have another theory? You have one more minute. On significant relief? If you want to, or your choice. Again, I can talk about significant relief. I can talk about it when I get back up, but significant basis, I think, is the shortest path to resolution because either significant basis or significant relief fails. We go back to federal district court, and here the magistrate judge collapsed the two tests, in my view, with the additional ability-to-pay inquiries that were happening. The magistrate judge said, because I find that they are responsible for a significant basis of the— That is necessarily true that they're seeking significant relief because they're seeking relief for the conduct from 2015 to 2018, but that's not what this court has said. They're separate tests. They need to be separate inquiries, and they need to be separately satisfied. So I think that that's error of the magistrate judges as well. And I'll take my five minutes when I get back up. Thank you. Thanks. Good morning, Your Honors. Thank you for having me today. My name is Sarah Anderson. I represent the State of Louisiana Division of Administration. If you'll please the Court, I'd like to just go ahead and hop on straight into the issues. The first issue that was raised by the appellants was the question of whether or not there are enough parties to satisfy Catholic jurisdiction.  in favor of Catholic jurisdiction. I believe in the Cozzo case as well as— Can you be a little louder? Yes, ma'am. Sorry. I'm trying to slow my speech while, you know, inadvertently getting soft. Slow and loud. You got it, ma'am. I'm a fellow fast talker. I sympathize. Yes. I'm sorry. I'm a Yankee. So the Cozzo case in the Fifth Circuit very clearly stated that the law enforcement districts are not separate entities from the sheriffs that can sue and be sued in their own right. That is this court right here, as well as the 1997 Louisiana Supreme Court case in Valentine said the exact same thing. It is very clear. It is not disputed by any other court. In fact, I think the Fifth Circuit was also relying on the Pichon case and listed Louisiana Circuit Court's opinions from the Third and Fourth Circuits, which would simply, if applied strictly to this matter, would demonstrate that law enforcement districts cannot sue and be sued separate from the sheriffs, and therefore there straight up is not Catholic jurisdiction because there are not enough plaintiffs. The next issue is the significance test, which is the only element that must be met as to any of the local defendants in this matter. And as the court rightfully pointed out, there are a couple of issues here. With the significance test, you have to look at both. You have to look at the allegations of the complaint, which I believe are very clear in this matter. And as you will notice, our opposition does nothing to combat the temporal aspect of the significance. In fact, if you look at the pleadings themselves, they specifically state in a chronological fashion to distinguish those roles of the local defendants from the out-of-state defendants for both significant basis and significant relief. And so if you walk through those paragraphs, you have Paragraph 10 as well as Paragraph 11 through 13. Well, as we saw in Paragraph 48, the temporal limit of injurious conduct spanned 2015 to 2020. In Paragraphs 10, 11, through 13, the plaintiffs very clearly state that the injurious conduct was exclusively perpetrated by 1120 South Point as well as Gregory Teters during that time. And in fact, although we would say that extrinsic evidence is not admissible in this matter, you will see on the contracts that the defendants sui sponte produced themselves that we did not ask for show Gregory Teters' signature on many of those contracts. So looking at Paragraph 10, what was effective about the products? In Paragraph 10? Paragraph 10 is going through the corporate history, Your Honor, of the entities themselves to demonstrate who is in control and acting as the cybersecurity administrators and the products themselves. I'm happy to answer any questions you have about the products. That is my entire life pretty much. That's great. I'd love to hear. So the products themselves actually contained effective software code that was not consistently updated and properly patched through over the years. They just continued to use it. They would make slight alterations. And in addition to that, they also provided defective services. So for managed security service providers, there are two things that they usually do. Sometimes they write their own software code as present here, and sometimes they deliver services related to the effective provision of that software. So actually in Paragraph 48 as well as in Paragraph 75 in Paragraphs 8 through J, you will see very specific instances in which they failed as the administrators, not just the code providers that this court already keyed in on, but the administrators of that software to provide, to ensure that the products that their software relied upon were not pirated, in other words stolen, only admissible in Korea and in the European Union. And last time I checked, Louisiana sheriffs were here. They did not make sure that their software was properly patched according to updates. If you notice on the bottom right-hand corner of your screen on your computers, every once in a while you see a little orange dot that says Update and Restart. None of that was ever performed. But I understand that, and that's very helpful, and I'm happy to talk about that as much as you like. Yes. But obviously the relevant legal question is what in this petition disaggregates 1120 South Point, I-3 verticals, and its various corporate affiliates? Absolutely. If you look at Paragraph 48J, you'll see that they failed to go ahead and renew their email filtering software on their computers, and that's extremely important because that serves as a very large window borderline, like a French door to their network that would allow the imposition of malware to come in through emails. You've heard of business email compromise and phishing attacks. When you fail to renew your email filtering software, you allow viruses to come into your network. And since they were acting as the administrators through, again, pirated Amy Admin software that they intentionally stopped their antivirus from using, they basically were acting as though they were that person. They had the juridical control, so to speak, of that network, and so if they're infected, that infection just spreads like wildfire. They become patient zero. Not really wildfire, right, because it takes three years, apparently. That's just one of the instances of misconduct. So malware is not just a one-time event. If you were to sample any network that's been in existence for a while, you could see several kinds. But, yes, this is sort of an open pathway, and these practices were consistent, and that's the basis of our allegations. And, again, we've been actually warned in the Coleman v. Estes case as well as the Coffey case not to kind of get into a factual swamp and try to conduct a mini-trial on the allegations, but the allegations are consistent that these practices were ongoing from 2015 to 2020 with a specific instance in 2016 of a massive failure to administer their products properly and their services, as well as a temporal aspect to show that the only parties that could have been responsible for some of these actions that occurred in that five-year period, there are three and a half more years, or while quantitative analysis is not required by the courts, show that 60 to 70 percent of the acts were perpetrated, as alleged, by those local defendants because they were the only ones in existence. Is your understanding . . . I'm sorry. I was just going to ask, could you say that in 2016 they basically opened the door? I would say they opened the door before that. Maybe sometime before, but certainly before 2016 they opened the door. And bad things come in the door, and their job is to kick the bad things out of the door but also to close the darn door. And so they neither closed the door and they didn't clean out the bad things that came in. And that's like a . . . for people that are not into computers, that would be a way to explain it. Is that what you're saying? They didn't do . . . In the sense that that was definitely one instance that we can pinpoint to without obviously the benefit of trial, discovery, corporate depositions. And it would last while the door is still open. Yes, ma'am. So it doesn't matter if it only was open before 2016 because the door is still open, and the door still allows more bad, and your job is to make sure that nothing bad is coming in to get rid of the bad. Yes, ma'am, and to constantly respond to the . . . So this is a rapidly changing industry, as I'm sure you're aware. And so the need is to make sure that you are constantly responding and providing that reasonable commercial standard of service, and that was not provided. So it's not just a single instance. It really is a continuing tort. And you can see this by analogy, and this is not in the brief, so I do apologize since this conversation has gone this direction. But if you look at the Biometric Information Privacy Act, they look at every single time that the situation or the requirements for consent when collecting biometric data are not followed. They don't look at the one-time failure of, hey, you didn't put in the consent for this one instance, and now, you know, so it's just that one tort. It's a continuing tort. Every day . . . I appreciate this, but obviously the only thing that matters to our court is what's in this petition. Yes, ma'am. Right? Yes, sir. So we need to talk about what's in this petition. Yes. And I don't see anything in here that says that that failure to renew an email filtering subscription in 2016 opened a door, caused the tort, was responsible for the December 2019 breach. Like there's nothing that could . . . I appreciate your very eloquent argument, and you obviously understand a lot about the way this works, and you could even be right about all of it. It doesn't say that. Yes, Your Honor. I would very respectfully disagree. I think when you break down the corporate history of the parties, you show the only ones that were in control of that time period. And these events, the breach, it's one of these things where it's accumulation of bad practices. And I think it was also in our briefs before the court that, and my esteemed co-counsel explains this much better than I do, but if you're throwing rocks at a house over a two-day period, it's not that one instance of that one rock. It's continuing. So it's the fact that they failed to provide these services, failed to patch their own code, which is alleged herein, and that corporate ownership is knowing there's only one party that could be involved here. And it's not the local defendants because they weren't in existence. And to further distinguish the conduct for a significant basis and significant relief, I'd also like to point out that there is a claim that is only asserted against the local defendants. It is not asserted against the out-of-state defendants in Redhibition in 97 through 102. So here I think the significance test is overwhelmingly met both from a basis and relief because you have 100 percent of the plaintiffs suing all of the local defendants. You have the local defendants exclusively involved in the negligent conduct for three-and-a-half of the five years of the tortious period with an instance of, and by the way, you'll notice there is an instance of failure to act that is specifically outlined in 48J. There's 12 instances of negligence that are continuing. And on top of that, there is an additional cause of action that is only alleged against the local defendants to the exclusion of the out-of-state defendants. What changed exactly in 2018? I know it was a corporate ownership issue. It was a corporate ownership issue where I believe 1120 South Point and Gregory Teeters were bought out by I-3 Verticals. Right. I understand that. But what else? I believe, well, they kept using the same contracts with the same name, and so a lot of it you could argue would be continuing on behalf of the local defendants, and they are still using the same contract. So it's sort of like my New Orleans law firm analogy works in your mind at least? Yes, sir. From the client standpoint, it was all still the local operation. It's still continuing because they're still perpetrating those bad practices. However, really it was an ownership and then the involvement of Scott Carrington at the time where he took over for Gregory Teeters, and I believe that's in his affidavit that they submitted. Thank you. Thank you. Good morning, Your Honors. My name is Paul LeBlanc. I represent the sheriffs. I'd like to follow up, Judge Oldham, on your question. I think what's confronting the Court now is the scenario that arises whenever you have a continuing tort over a long period of time with multiple actors involved. I'll address in a second the issue of the legal structure because this is brought under the Louisiana law, and obviously it's a tort claim. But I'd like to address things in a sequence if I could. Number one, I appreciated your questions, Judge Elrod, but I want to make clear the issue of defective products is a limited aspect of this case. That's a claim that's in Redhibition, Louisiana, a warranty law that's brought only against the local defendants. And again, as alleged, most of the products were bought up front, and they came with a service agreement that was renewed automatically year after year. We've specifically alleged there were a few instances where, after 2018, they signed new contracts or renewed contracts with the new corporate ownership. But to address your point, Judge, nothing changed in terms of the applications themselves. It was a continuation of the prior products. That's one aspect of the case. And the products were deficient because they allowed, did not sufficiently protect against, malware intrusions. And I think, as my learned co-counselor, who knows far more about the subject than I do, has indicated, malware, and I think this is fairly alleged, malware comes in, it's unnoticed, it takes root in your system, and it does bad things over time. The second aspect, which I think is the continuing conduct aspect, that's the one that may be sort of more at issue here, is the fact that you have a situation where the different people engaged in the same conduct at different times. And that's what you have here. I mean, I could draw lots of analogies. We had a cute little analogy in the complaint about guys throwing rocks. I mean, you could do it many different ways. You have a Louisiana company that manufactures and engages in various wrongful practices that allow exposures that damage a neighbor's property, wrongful affluent controls, improper releases, et cetera. An out-of-state company comes and takes over the operation but continues those practices and substance, and the damage continues. That obviously, at some point— What's the paragraph or set of paragraphs of the petition that, in your mind, most clearly states that it was not conduct in 2020 that created the 2020 intrusion, but that it was, in fact, sort of an accumulation of every single day for five years? I think it's paragraph 40, I believe, is the one that's illustrative, but it indicates very clearly at times over 2015 to 2020. Clearly, they're absolutely correct in that respect. We clearly say at different times between 2015 and 2020, these practices led to bad things happening to our systems that ultimately destroyed them. And I think, again, that's the situation you're going to have in any fairly— So the idea is essentially that in 2015 it was a bad system. These systems don't just—you don't just buy them. You have to maintain them and service them, and you rely on the provider to do that. But it's the idea that it was bad in 2015, but it could have been fixed in 2016, could have been fixed in 2017, could have been fixed at any moment, and simply never was. Is that— No. Yes, in part, yes. The obligation to fix—keep in mind, again, that we're dealing with the course of conduct now as the cybersecurity administrators. They're not only selling the products. They're administering these systems on a day-to-day basis, just like your IT section administers your IT. They're keeping it going. They're keeping the lights on. They're upgrading it with new intrusions and new— But not only that, not only that, they're engaging in practices that themselves allow in new malware. Their practices, in terms of the way that they're— and these are put, I think, in some detail in paragraph 40. There's a whole list of them, in terms of the practices that they undertook. And I want to be clear here. The issue is not that they damaged the system. They were charged with keeping our systems secure, and they failed to protect. That's the nature of the claim here. It's a negligence claim. It's a breach of fiduciary duty claim. Counsel, can I—I totally understand what you're saying, and it makes perfect sense, and your friend on—your co-counsel makes perfect sense that why you would sue all of these defendants, and you can have liability against all of them. So I don't think there's any dispute about the continuing tort, and at times between 15 and 20. The thing that I'm hung up on is that I assume you would agree with your friend on the other side from I-3 that you have to disaggregate who did what when in order to get the local controversy exception. It's your burden, right? You agree with that, and you agree that you have to disaggregate, right? I do agree, and I think that the temporal aspect does disaggregate because, again, I'm saying we're not going to be able to distinguish between what was done because the same defendants at different times did the same thing or, more correctly, failed to do the same thing. And I think in terms of disaggregation, if you're looking beyond that, I can't imagine a continuing tort scenario where you're ever going to find a significant basis for conduct. Now, I would point out in that regard, we were very clear in our briefing to point out this is controlled by Louisiana comparative fault principles. Under comparative fault principles, a trier of fact is going to consider a variety of factors, including the role of the individual defendants, the duration of their conduct. So we think that under Louisiana law, the legal structure here, we don't have to go any further. And frankly, to be honest, Your Honor, I'm not sure that we could because of the nature of this arm. Just like the property owner who's got accumulated property damage over ten years of emissions. I don't know how that person can ever prove for the first five years this part is – you just have – at the end of the day, you have an injury. Well, let's use that. So you talked about environmental torts or property damages. So we see those cases all the time, too. And the way that those are usually pled is someone – and obviously this is not to get through CAFA or either get in federal court or state court. But folks will come in and they will say, look, not totally obvious. This comes up in limitations cases, for example. Not completely obvious when the tort started. But here are three but-for causes of the tort, right? Obviously, it's our job to draw up the approximate cause. But like they'll say, one, it was defective in its installation. Two, it was defective in maintenance. And three, here's the breach in the damage to our property. So they allege three different things. And if you had alleged it that way in this petition, then we could actually make a comparative disaggregation. But there's no allegation of a single but-for cause, much less multiples sufficient that we would be able to disaggregate and say, well, I-3 did two and 1120 South Point did one or vice versa. You see the hangup? I do, and I have to respectfully disagree. I mean, I've on both sides dealt with many of those petitions and complaints as well. And they're typically pleaded in exactly the same manner we plead them here. We have a list of a series of actions, practices, conduct that were defective, that were negligent, and that caused the injury over time conducted by these different defendants in the time periods that we specified. That's the manner, and again, I don't mean to be presumptuous, but that's the manner in which these things are typically pleaded. And that's what I said. This is a situation of a continuing tort over time. And that's, I think, the issue before the court. What level of disaggregation is required? I mean, what you're indicating is a level of proof that, frankly, isn't required on the merits because this all goes to the jury and they consider it. They consider the period of time of the individual defenders. They consider their actions. They consider the variety of factors that we've looked at. And this is not the sort of thing that typically gets proven at any point. And I think that, again, I think we've talked in our brief about this Court's resistance to impose a heightened pleading standard on this. It seems to me that asking for that level of proof at this stage of the pleadings more than what would ultimately be required to prove our case in a compare-to-fault jurisdiction. But that's what I'm hung up on is that no one's disputing liability. I don't think there's any argument that you've pled a cause of action. I don't think anyone's talking about dismissing this for failure to state a claim. The only question is whether Congress wrote the statute. They've decided the way federal court jurisdiction is going to work. They said that if it's going to stay here, unless you can show me that it's been disaggregated, it's sufficient to meet the local controversy exception. You see what I'm saying? So you might be completely right about every single thing you just said, but it's a jurisdictional question about which court you're going to get to tell that to, our court or the Louisiana state courts. I understand. And I think the specific congressional question is, is the alleged conduct significant in relation to the others? The alleged conduct here is the same. It's the same practices. Is it disaggregated? Yes, because one took place during a three-and-a-half-year period of time. The other took place during a roughly two-year period of time. If you have to get more specific than that, again, I don't know of a continuing tort scenario where you're ever going to be able to satisfy that basis. And I think what the statute requires is that there be a distinction in the allegations of conduct. This is not like Obluxus General, where, frankly, I think the court's problem was it couldn't figure out what it was the in-state defendant was alleged to have done. There was sort of a blanket allegation of joint and several liabilities, solidary liabilities, as we call it in Louisiana. And I think the plaintiff there was relying on that to sort of carry the day, and the court said, no, you haven't told us what this guy did. I think we've told you very specifically what the in-state defendant did and when they did it. What we really can't do is what the law doesn't require us to do, is sort of untangle specific causation as to specific injuries over time. And, again, I would sort of come back to the point that this is a Louisiana tort case. Under Louisiana tort law, we have more than distinguished the claim here, and we've more than disaggregated it. Is that significant? Does Obluxus require you to show that it's 65 percent versus 50 percent versus 15 percent? Is there any kind of requirement to show a particular amount is significant? No. That's the term significant. Significant has a book, noteworthy, meaningful. I mean, you know, the court can. Can 5 percent be meaningful, or does it have to be 75 percent? I think that's a question that's not really before the court in this case, because here, again, dealing with the conduct alleged, which is all we're talking about now, we've alleged that the same conduct took place at different times, and because more than 50 percent of the time period dealt with in-state defendants only, most of the conduct, and again, under a comparative fault regime, what a jury would be compelled to find with a judge instructing it properly would be that that's where the lion's share of fault would go. Do you have to show that that's where the lion's share of the fault is, though? Is that the requirement under the law? I don't believe so. I believe, again, the term significant has a dictionary meaning. It's something that's noteworthy. I think it would be anything that's not insignificant, and I think as the Court's aware, most of the cases dealing with the significant basis or the conduct aspect of it have dealt with where you have sort of a corporate defendant and a solitary individual who was merely there as sort of an agent of the corporate defendant. Thank you. I appreciate it. Would you agree that if this had been filed in 2018 before the corporate changeover, we'd obviously have a local dispute here? There would be no out-of-state defendants in that case. Right, exactly. So the question then, to me at least, and I want your response, is something that has to have changed in 2018 to make this from an obviously local, in fact, only local dispute to something that is not even as significantly local? I don't think that it requires a change. And I kind of want to go to a question that Judge Oldham had asked. Answer it however you want. Right. The issue, we're not trying to figure out who is ultimately liable at the end of the day. We're trying to figure out where the case can be decided. And under CAFA, the question is, if this is a local dispute, you do it in state court. But if this is an interstate dispute involving a real dispute between citizens of one state and citizens of a different state, it's an interstate class action that can be heard in federal court. I'm not sure that's right. I mean, why can't a case be both simultaneously an interstate dispute and one in which the local defendant has a significant basis? I think if the local defendant is a significant defendant under the local controversy exception, the federal courts have satisfied themselves that the local defendant's presence is significant enough that it's fine to be heard in state court. So that's where, to your question, Judge Elrod, I don't think 5% is significant. Significant, you know, we can look at dictionary definitions. Blacks says momentous, of special importance. Merriam-Webster says having influence. But the point is, who is more important in this case, the in-state defendant or the out-of-state defendant? Do you have to be more important or do you just have to both be important? I think you have to be more important. Where does it say that in the statute or in the case law? In Opelousas. It doesn't have to be more than the federal. The local interests have to be more than the other interests. It just says the local interest must be significant in the statute and the case law. The word significant doesn't have any objective measure in a vacuum. Significance is measured in context, which is why I think Opelousas says— It's not diminutive. We know that for sure. Absolutely, absolutely. What's not clear to me is why does that have to be dominant? And I don't know that it needs to be dominant, but I think a perfectly equal scenario, that isn't the significant defendant. So if I may, I don't mean to monopolize your reply time, but just really one question at the end of the day. Let's imagine a fact pattern, which this may very well be, which is you have five years of conduct. We don't yet know, at least at this stage, what caused the injury. So let's just stipulate a scenario where, you know what, we don't know, and it will never be known. We just know that it was five years of conduct. It was only local conduct for a three-year period. And then for the balance, it was some sort of mix. I don't know if it's 95 to 5 or 50-50, but it's some sort of mix. But the point is we have no idea who sourced it. Why wouldn't that be significant? I think if you cannot distinguish between the characters, between the actors, the defendants, then it's not— First, you've not satisfied this Court's test in Opelousas, but assume Opelousas doesn't exist. It's not a local controversy then. The out-of-state players are as important in adjudicating that dispute and discovery, in pursuing liability, in pursuing damages, as the local defendant if you have no idea who did what. So if you have this kind of tort where it's just really hard or impossible for scientists and forensic people to identify a particular source, then it can never be a state-of-the-art basis to— First, I have an issue with the premise because this isn't a continuing tort. A continuing tort under Louisiana law is when conduct continues unabated. If it stops, the conduct is no longer continuing, the tort is no longer continuing. And in looking at the allegations of paragraph 48, what they're saying is a continuing tort doesn't make sense. So one of the allegations is that employees went to inappropriate websites during business hours. That's not something that happens all the time, every day, at every moment of every day. That is a specific act that starts and stops. That's not a continuing tort. The very next sentence— I take it their theory is the software as purchased in 2015 was insufficiently secure, whatever that means to the techies, and was never improved over the five-year servicing period. So, again, according to the allegations of paragraph 48, they're referring— there's a couple of instances of specific software. Microsoft Word, Adobe, that gets loaded onto a computer at a particular time. It gets updated or not at a particular time. This idea that you just said that employees don't constantly go on things that open themselves up to danger, I don't think that's correct as a matter of common sense. Employees are constantly exposing the company or the government or whoever to danger because it's ubiquitous in society now. You have to keep the door closed and locked and continue to upgrade to keep it out. So just even doing—it doesn't have to be that they're looking at international porn or something. Any kind of going on lots of sports sighting or something can cause this to invade. So I don't think that that's true, that it's not constantly happening over time. It's happening every day in most large companies, in most large enterprises. Two responses, Your Honor. The very paragraph where they say that the employees went to inappropriate websites during business hours, the next sentence says that is not per se bad, but sometimes that exposes people to phishing. There are no allegations that anybody was exposed to a phishing scam here. It says sometimes can be extorted on those websites. There are no allegations that anyone was extorted here. So that act in and of itself is not a problem. It doesn't matter. If I run a red light on my way to work and hit no one, it doesn't matter. The other issue, Your Honor, is— Well, it could suscept you to liability. To whom, if I didn't hit anyone? The law enforcement. Right, but the other point— I don't think that's the best hypo. The other point I wanted to make, Your Honor, is, you know, I appreciate the panel of judges trying to orient this into something that's more easily understood, but again, the standard is that doubts are construed in favor of jurisdiction, and that's not unique to the Fifth Circuit, the Sixth Circuit, the Eighth Circuit, the Tenth Circuit, and the Eleventh Circuit. We've been doing Catholic cases for a long time. We're very familiar with— I know, Your Honor, but trying to lean one way or the other is inappropriate unless we're leaning in favor of jurisdiction under this court's precedent. No, we're not leaning if we're trying to determine what is significant. That's our task at hand. I understand, Your Honor. My point is saying, oh, the door was opened, and then it was never closed. Nothing says it was closed. Nothing says the door stays open either. The door stays open until it's closed. But you're assuming— No, you're not assuming. Again, you're making an assumption in favor of the plaintiffs, which is contrary to this court's precedent. Okay, so you don't think it's saying that the door was open and stayed open in the fairly reading the complaint? I don't think so, because if it's a renewal activity, renewing your email filter, it happens again and again every year. It doesn't say it didn't— It didn't get renewed. It didn't get— Once. Okay. I'm just reading from the complaint. I appreciate that, Your Honor. Again— Judge Oldham has a question for you, so that's a good way to stop. I realize you've had a very hot bench. Yes. And I just wanted, before we conclude the argument, what do we do with significant relief? Is there anything—I haven't heard about it. Yes, so significant relief, first and foremost, it's going to require the same comparison that Opelousas requires on significant basis, because there Opelousas was interpreting significant, not basis, not conduct. In the district court, the sheriffs had asked the magistrate judge to apply a particular test, outlined that test. That test said ability to pay and made some arguments about why the local defendant here should be able to pay based on nothing in the complaint, nothing in the record. Our arguments on significant relief is that that goes to show the district court's error. The district court was willing to construe doubt in favor of remand rather than in favor of jurisdiction, and that was completely inappropriate. So based on the sheriff's arguments as they were made below, they fail on significant relief. Thank you.